D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
JOSEPH PERROTTO,

              Plaintiff,

    - against -

JO ANNE B. BARNHART,
Commissioner of Social Security,

              Defendant.
--------------------------------------------------X
GARAUFIS, District Judge

MEMORANDUM AND ORDER
06-CV-1212 (NGG)

      Joseph Perrotto ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) to

challenge a final determination of Jo Anne B. Barnhart, Commissioner of Social Security

("Commissioner") denying his application for Social Security disability benefits. The court now

considers cross-motions for judgment on the pleadings. For the reasons set forth below,

Plaintiff's motion is denied and the Commissioner's motion is granted. This case is therefore

dismissed.

## I.    BACKGROUND

### A.    Procedural History

      Plaintiff filed an application for disability benefits on March 21, 1997, alleging that he

could no longer work due to a back injury sustained on March 22, 1989, while working as a

detective for the New York City Police Department ("NYPD"). (Record ("Rec.") at 256-57.[1]

Plaintiff's claim was denied both initially and upon reconsideration. (Id. at 46-47, 50-53.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

---

[1] "Rec." refers to the record filed with this court by the Commissioner. It contains transcripts of
hearings, ALJ rulings, and exhibits.

May 20, 1998 by ALJ Peter F. Crispino. (Id. at 24.) In a decision dated July 27, 1998, ALJ

Crispino found Plaintiff not to be disabled. (Id. at 21.) The Appeals Council ("Council") denied

review of the ALJ's decision on October 6, 1999. (Id. at 4-5.) Plaintiff subsequently filed a civil

action in the United States District Court for the Eastern District of New York. (Id. at 320-21.)

On February 26, 2001, the case was remanded for a supplemental hearing pursuant to 42 U.S.C.

§ 405(g), which provides that a district court "shall have power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing."

On December 20, 2002, ALJ Michael P. Friedman held a supplemental hearing. (Rec. at

301.) On April 11, 2003, ALJ Friedman denied Plaintiff's application for benefits. (Id. at 256.)

Plaintiff filed exceptions to ALJ Friedman's rulings. (Id. at 269.) On April 1, 2004 the Council

assumed jurisdiction and issued an order remanding this case to an ALJ for further consideration

of Plaintiff's residual functional capacity, as well as to obtain further testimony from a

vocational expert. (Id.)

On December 2, 2004 ALJ Friedman held a second hearing on remand from the Council;

he subsequently denied Plaintiff's claim. (Id. at 242, 267.) On January 12, 2006, the Council

determined that the Plaintiff was not disabled prior to December 31, 1995, the last day he was

insured. (Id. at 231.) The Council adopted ALJ Friedman's decision to deny Plaintiff's claim,

though it rejected some of his reasoning. (Id. at 231.)

Plaintiff timely commenced this action on March 13, 2006, seeking review of the Commissioner's decision denying his application for disability benefits. 42 U.S.C. § 405(g) (stating that an action must be commenced within sixty days, or such time as the Commissioner may allow after, receiving notice of an unfavorable decision).

### B.     Plaintiff's History

#### 1.        Background

Plaintiff was born on July 2, 1947. (Id. at 27.) He earned a General Equivalency Diploma in 1971. (Id.) He worked as a detective for the NYPD from October 1973 until July of 1975 and again from April 1976 until August of 1990. (Id. at 107.) As a detective, he investigated robberies, rode and walked in assigned areas, and responded to emergency calls. (Id. at 108, 114, 314-15.) This work generally required him to walk for three hours, stand for three hours, and sit for two hours during an eight-hour workday. (Id. at 108, 114.) He frequently had to lift between twenty-five and one hundred pounds. (Id. at 110.)

#### 2.        Medical Evidence From the Relevant Period

To qualify for disability benefits, a claimant must be insured at the time he becomes disabled. Arnone v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989). Therefore, Plaintiff must show that he became disabled before December 31, 1995, the last date he was insured.

Plaintiff injured his lower back on March 22, 1989, while working as a detective for the NYPD.[2] (Id. at 141.) The following day, Dr. Janice Cully, an NYPD physician, reported that an x-ray of Plaintiff's lower back did not reveal any fractures. (Id. at 143.) Dr. Cully diagnosed the

---

[2] Plaintiff injured his back while he was in pursuit of a fleeing suspect. (Rec. at 141.) As Plaintiff chased the suspect, Plaintiff ran down a flight of stairs, one of the steps broke, and Plaintiff fell, twisting his back. (Id.)

Plaintiff with acute back strain and prescribed Flexeril and Tylenol #3. (Id. at 142-44.) On May 11, 1989, Dr. Culley noted that an MRI revealed herniated discs at L4-5. (Id. at 145-46.)

Dr. Edward Axelrod, an NYPD orthopedic surgeon, examined Plaintiff on June 26, 1989. (Id.) Dr. Axelrod reported decreased back motion with a positive sciatic stretch test on the right side of the back. (Id.) He reviewed the MRI results and concluded that the Plaintiff had disc herniation on the right side. (Id.) Dr. Axelrod also noted that Plaintiff had no reflex change. (Id.) He recommended that Plaintiff undergo surgery, but Plaintiff declined to do so at that time. (Id.)

On July 12, 1989, Dr. Cully observed that Plaintiff showed no improvement and recommended that he begin physical therapy. (Id. at 144.)

On July 13, 1989, Plaintiff began treatment with Michael Marino, a physical therapist. (Id. at 148.) Marino reported that Plaintiff had lumbar scoliosis and occasional muscle spasms. (Id.) He also noted that Plaintiff's range of motion was restricted and his functional abilities were limited. (Id.) Marino treated Plaintiff with moist heat, electrical stimulation, ultrasound, and massage, which relieved Plaintiff's symptoms. (Id. at 147-48.) Marino gave Plaintiff a TENS unit for home use and reported that it provided him relief. (Id. at 147.) On October 1, 1989, Dr. Cully noted that Plaintiff had a herniated disc at L4-5 and multiple degenerative discs. (Id. at 149-50.)

On April 3, 1989, Plaintiff began visiting Drs. Martin Weseley and Arthur Eisenstein, who are orthopedists. (Id. at 73-76.) At this first visit, Dr. Weseley observed that Plaintiff was in obvious spasm and had a reversal of the normal lordotic curve with a right-side lean. (Id. at 163.) Dr. Weseley also observed diminished sensation from the mid-right thigh distally. (Id.)

4

Plaintiff's straight-leg raising was limited to thirty degrees on the right and sixty degrees on the left. (Id. at 164.) Dr. Weseley also stated that Plaintiff had acute lower-back derangement, "probably discogenic in nature." (Id.)

On April 14, 1989, Plaintiff underwent another MRI. (Id. at 162.) Dr. Weseley reviewed the results and noted (1) severe degeneration in the L2-3, L3-4, and L4-5 discs, (2) evidence of ventral and right foraminial L4-5 disc herniation, and (3) a bulging disc at L2-3 with probable herniation. (Id.) On April 26, 1989, Dr. Weseley recommended a lumbosacral support and prescribed Indocin. (Id. at 165.) On June 14, 1989, Dr. Weseley noted that Plaintiff continued to have persistent "symptomatology" and prescribed Darvocet. (Id. at 161.) Dr. Weseley switched Plaintiff's prescription to Talwin NX on July 13, 1989, because the Darvocet was not working. (Id.)

Dr. Weseley reported that Plaintiff had marked right paravertabral muscle spasm, multiple degenerative discs, and left-side pain. (Id.) Plaintiff reported that taking Motrin provided him some relief. (Id.) Dr. Weseley also prescribed Ansaid. (Id.) On September 1, 1989, Plaintiff reported that his upper-lumbar pain had disappeared and that he continued to have lower-back pain. (Id. at 160.) Dr. Weseley concluded that the pain was caused by the herniated disc at L4-5 and recommended that Plaintiff not bend, lift, or carry heavy objects or sit or stand for prolonged periods of time. (Id.) In a letter dated October 11, 1989, Dr. Weseley reiterated that Plaintiff should not bend, lift, or carry heavy objects, and could not perform any type of police duty. (Id. at 159.)

Plaintiff returned to Dr. Axelrod on November 7, 1989. (Id. at 151.) Plaintiff's condition was unchanged, except that he now complained of numbness in his legs. (Id.) Dr. Axelrod once

again recommended surgery and Plaintiff again declined. (Id.) Dr. Axelrod noted that Plaintiff could not work as a police officer at that time. (Id.)

Dr. Stephen Kulick, a neurologist, examined Plaintiff on November 20, 1989. (Id. at 153.) He viewed Plaintiff's April 14, 1989, MRI and concurred that Plaintiff had degenerative discs at L2-3, L3-4, and L4-5, possible right-side herniation at L4-5, and a bulging disc at L2-3 with possible herniation. (Id.) Plaintiff's neurological examination was normal, except that his straight-leg raising was limited to twenty degrees on the right and to thirty degrees on the left, with decreased sensation at the lateral L5 margin on the foot. (Id.) Dr. Kulick diagnosed disc herniation on the right at L5 and recommended a myelogram. (Id.)

On December 14, 1989, Plaintiff once again met with Dr. Weseley. (Id. at 160.) Dr. Weseley noted that Plaintiff continued to complain about pain related to the discogenic lesion at L4-5 and had right foot dorsum pain. (Id.) Plaintiff's deep tendon reflexes were present and symmetrical. (Id.) Dr. Weseley noted that Plaintiff should not bend, lift, or carry heavy objects, though he could "do restricted or light duty" work. (Id.)

Dr. Weseley reexamined Plaintiff on January 11, 1990. (Id. at 158.) He observed that Plaintiff used a cane and had restricted lower-back motion. (Id.) Straight-leg raising on the right had increased to thirty-five or forty degrees. (Id.) Dr. Weseley repeated his determination that Plaintiff should not bend, lift, or carry heavy objects or sit or stand for a long period of time. (Id.) He added that Plaintiff should not drive for long distances. (Id.) He concluded that although Plaintiff could not work as a detective, he could perform a light duty job such as dispatcher. (Id.)

6

Dr. Hossein Firooznia from New York University Medical Center reviewed Plaintiff's April 14, 1989, MRI results and issued a report on February 12, 1990. (Id. at 169-70.) He concluded that the MRI was a "substandard MRI examination of the lumbar spine" and recommended a CT scan. (Id. at 170.) On February 16, 1990, Dr. Weseley indicated that he did not object to Plaintiff undergoing a CT scan but did not think it would be of much help unless it was accompanied by a myelogram. (Id. at 158, 169-70.) Dr. Weseley also noted that Plaintiff's condition had not improved and that he still had significant pain and restriction of motion, and had difficulty with straight-leg raising. (Id. at 158.)

On March 15, 1990, Dr. Weseley noted that the CT scan showed a degenerative disc at L4-5, with a right-sided herniation and a disc fragment. It also indicated ridge formation and narrowing of the right neural foramina, and mild degenerative disc disease at L3-4. (Id. at 157, 172-73.) He further noted that the CT scan, MRI, and clinical findings indicated a discogenic lesion at L4-5 with a fragment in the foramen. (Id. at 157.) He once again noted that Plaintiff could not bend, lift, or carry heavy objects, work in awkward positions, or sit or stand for prolonged periods of time. (Id.) He added that Plaintiff must remain on "light duty." (Id.)

There is no evidence in the record that Plaintiff sought any medical treatment after March 15, 1990, until he saw Dr. Thomas Mammana, a chiropractor, on November 25, 1994. (Id. at 176-81, 214-19.) Dr. Mammana treated Plaintiff three times a week for two weeks between November 25 and December 5, 1994. (Id. at 176-77.) In a report submitted on December 5, 1994, Dr. Mammana wrote that Plaintiff had intermittent lower back pain and responded favorably to treatment. (Id.) Dr. Mammana concluded that Plaintiff could not sit for more than one to two hours daily, could not stand for more than one to two hours at a time, and should rest

7

periodically throughout the day. (Id. at 178.) He also concluded that Plaintiff could stand or walk for up to six hours per day and could push and pull without limitation. (Id. at 179.)

### 3. Medical Evidence After the Relevant Period

In an evaluation completed on April 27, 1998, Dr. Mammana stated that he had been treating Plaintiff once a month beginning in 1997. (Id. at 214.) He noted that Plaintiff could lift or carry five pounds, or "very little," for up to one-third of an eight-hour day. (Id. at 216.) Dr. Mammana concluded that Plaintiff could stand and walk without interruption for up to twenty minutes at a time during an eight-hour day. (Id. at 217.) He also stated that Plaintiff could never climb, balance, or crouch and could occasionally stoop, kneel, and crawl. (Id.) Dr. Mammana concluded that Plaintiff's impairments affected his ability to bend, push, and pull and that Plaintiff should not be exposed to extreme temperatures or high humidity. (Id.) He diagnosed Plaintiff with subluxation of the lumbar spine. (Id. at 219.) Dr. Mammana treated Plaintiff with spinal manipulation, lumbar traction, low-volt muscle stimulation, hydrotherapy, and cryotherapy. (Id.) He noted that Plaintiff responded favorably to the treatment and was being treated on a supportive and symptomatic basis. (Id.) Dr. Mammana also stated that Plaintiff remained "moderately impaired" and needed several rest periods during the day in order to function. (Id.)

On May 27, 1997, Dr. Eduardo Nepomuceno, Jr., a consultative physician, examined Plaintiff. (Id. at 186.) He noted that Plaintiff told him that his only treatment was to see Dr. Mammana once or twice a month when his "back start[ed] to act up" and that he took Tylenol for pain. (Id. at 187.) Dr. Nepomuceno did not observe any swelling, pedal edema, circulatory deficits, or muscle atrophy. (Id. at 188.) Patella reflex was absent on both sides. (Id.) He

8

noted that Plaintiff's cervical spine was "unremarkable" and that there was a full range of motion. (Id.) Plaintiff's lumbar spine had flexion to thirty degrees and lateral flexion to twenty-five degrees bilaterally. (Id.) Plaintiff also had some muscle spasms on the left but did not have any tenderness. (Id.) His hip flexion was thirty degrees on both sides while lying down. (Id. at 187.) Plaintiff had ninety degrees of forward flexion in the sitting position and normal external and internal rotation abduction and adduction. (Id. at 187-88.) Dr. Nepomuceno reported that straight-leg raising was positive at ten degrees bilaterally while lying down and sitting. (Id.) He also diagnosed Plaintiff with degenerative disc disease of the lumbar region, finding a herniated disc at L4-5 and possibly L2-3. (Id.) Dr. Nepomuceno concluded that Plaintiff could not perform his job as a police officer and could not do any activity that required bending, lifting, or carrying heavy objects. (Id. at 188.) He added that Plaintiff would not be able to return to his job as a detective for the NYPD. (Id.)

On June 19, 1997, Dr. John Cordice, a state agency physician, reviewed the record in order to assess Plaintiff's residual functional capacity. (Id. at 194.) He concluded that Plaintiff could occasionally and frequently lift ten pounds and could stand, walk, and sit for about six hours each during an eight-hour workday. (Id. at 194-201.) He did not find any other limitations. (Id.)

On August 4, 1997, Dr. Anthony Lanza, also a state agency physician, assessed Plaintiff's residual functional capacity. (Id. at 203.) He concluded that Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds. (Id. at 203-04.) Further, he noted that Plaintiff could stand and walk for at least two hours and sit for about six hours during

an eight-hour workday. (Id. at 204.) He also indicated that Plaintiff could not perform postural activities. (Id. at 205.)

### 4. Plaintiff's Testimony

Plaintiff testified at all three administrative hearings. At the 1998 hearing, he testified that, as a result of his back injury, he was unable to "move around, stand, sit for any period of time [or] lift any objects." (Id. at 29.) Plaintiff also testified that he was unable to work due to irritable bowel syndrome, gastritis, and depression.[3] (Id. at 30.) At that 1998 hearing, Plaintiff asserted that he had not seen any doctors from 1989 until 1994, when he saw Dr. Mammana, a chiropractor, for a two-week period. (Id. at 39-40.) He did not receive any further medical care until he saw Dr. Mammana in 1997. (Id.) Plaintiff testified that he could walk two blocks, stand for one-half hour at time, and sit for fifteen to twenty minutes. (Id. at 40.) He also testified that he could lift between five and ten pounds. (Id.) Plaintiff stated that he occasionally walked for exercise and that he fed and dressed himself independently with the exception of putting on his socks and tying his shoes. (Id. at 41-42.)

At the hearing held on December 18, 2002, Plaintiff testified that physical therapy did not help his pain and that medication did "very little" to help. (Id. at 309.) Plaintiff also stated that he needed to lie flat on his back every two hours to relieve the pressure on his back. (Id. at 311.) He testified that he could sit for fifteen minutes and walk half a block at a time. (Id. at 312.) Plaintiff stated that he could lift a one-pound bag of sugar, climb a few steps, and occasionally

---

[3] These conditions were not diagnosed until 1998. There is no proof in the record that Plaintiff had any of these conditions as of the date he was last insured, December 31, 1995. They are therefore not relevant to determining his eligibility as of that date.

10

take short walks. (<u>Id.</u> at 313.) Plaintiff testified that since his injury he always needed a cane when walking. (<u>Id.</u> at 317-18.)

At the hearing held on December 2, 2004, Plaintiff testified that during the relevant period (i.e., from March 22, 1989 to December 31, 1995) he could stand for thirty minutes, sit for twenty to thirty minutes, walk up to one city block, and lift two to four pounds. (<u>Id.</u> at 280.) Plaintiff also testified that he could not sit or stand for a certain amount of time without having to lie on his back for at least one hour. (<u>Id.</u> at 291.)

### 5.    Vocational Expert Testimony

Michelle Fass, a vocational expert, testified at the hearing on December 2, 2004. (<u>Id.</u> at 288-96.) She testified that it would be reasonable for an employee to take four short breaks during a workday in addition to a lunch break and official mid-morning and mid-afternoon breaks. (<u>Id.</u> at 289.) She identified bench assembler and surveillance system monitor as two jobs in the sedentary range that would permit frequent alternating between sitting and standing positions. (<u>Id.</u> at 294.) She testified that there were 2,960 surveillance system monitor jobs in the local economy and 65,000 nationally, as well as 500 bench assembler jobs locally and 129,000 nationally.[4] (<u>Id.</u> at 289-90.) Finally, Fass testified that if Plaintiff's description of his limitations was accurate, he would not be able to do any sedentary work, including jobs as a surveillance system monitor or bench assembler. (<u>Id.</u> at 293.)

---

[4] These numbers were accurate at the time of the hearing, not during the period relevant to this case. (<u>Id.</u> at 295-97.) Fass testified, however, that she believed it was unlikely that the numbers had changed significantly since the relevant period. (<u>Id.</u> at 295-97.)

## II.    DISCUSSION

### A.    Standard of Review

A determination of disability made pursuant to 42 U.S.C. § 423 may be reviewed by a

district court pursuant to 42 U.S.C. § 405(g).  The reviewing function of a district court is

limited: the district court may set aside the determination of the Commissioner only if the factual

findings are not supported by substantial evidence or if the determination itself is based on legal

error.  Id.; see also Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  It is the function of the

Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the

credibility of the witnesses, including the claimant."  Aponte v. Sec'y Dep't Health and Human

Servs., 728 F.2d 588, 591 (2d Cir. 1984).

### B.    The Commissioner's Determination

When the Council denies a Plaintiff's claim, the Council's decision becomes the final

decision of the Commissioner.  20 C.F.R. § 404.981.  Eligibility for benefits under Title II of the

Social Security Act is conditioned upon compliance with all relevant requirements of 42 U.S.C.

§ 423(c).  A claimant is not entitled to benefits unless he is insured at the time he becomes

disabled.  Id.  To be found disabled a claimant must show an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  Additionally, an

individual will be found disabled only if:

> [H]is physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work

exists in the immediate area in which he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

According to Social Security Administration regulations, an ALJ must use a five-step
sequential analysis to determine whether a claimant qualifies as disabled. Williams v. Apfel, 204
F.3d 48, 49 (2d Cir. 1999) (citing 20 C.F.R § 404.1520(a)(4)). First, the ALJ must determine
whether the claimant is engaged in substantial gainful work activity. 20 C.F.R. §
404.1520(a)(4)(i), (b). Second, if the claimant is not gainfully employed, the Commissioner
must determine if the claimant has a severe impairment that limits his ability to perform work-
related activities. Id. § 404.1520(a)(4)(ii), (c). Third, if such an impairment exists, the ALJ must
determine whether the impairment meets or equals the criteria of an impairment listed in
Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P ("Listing of Impairments"). Id. § 404.1520(a)(4)(iii),
(d). Fourth, if the impairment does not meet or equal a listed impairment, the ALJ must assess
the claimant's residual functional capacity, as defined in Section 404.1545, to determine whether
the impairment prevents the claimant from doing past work. Id. § 404.1520(a)(4)(iv), (e)-(f).
Fifth, if the individual cannot perform past work, the ALJ must determine if the claimant's
residual functional capacity prevents him from doing any other work. Id. § 404.1520(a)(4)(v),
(g).

If the claimant satisfies all five requirements, the ALJ will find him disabled. The ALJ
must consider "all evidence" in the case record. Id. § 404.1520(3). The claimant bears the
burden of proof for the first four steps. If he satisfies his burden, the Commissioner then bears
the burden of proof for the fifth step. Shaw, 221 F.3d at 131. The Commissioner may satisfy
that burden by showing that a claimant can perform other work in the national economy listed in

13

the Medical-Vocational Rules Grids ("Grids"). The Grids "provide predeterminations of disability or non-disability for individual cases based on various combinations of residual functional capacity, age, education and work skill." Davis v. Shalala, 883 F. Supp. 828, 832 (E.D.N.Y. 1995).

On February 26, 2001, District Judge David G. Trager of the Eastern District of New York ordered that Plaintiff's claim be remanded for additional administrative proceedings. Transcript of Trial at 10-11, Perrotto v. Massanari, No. 99-CV-7901 (DGT) (E.D.N.Y. Feb. 26, 2001). On remand, on December, 31, 2001, the Council ordered that an administrative hearing be held to reevaluate the medical evidence in accordance with the treating physician rule,[5] to explain the weight given to such evidence, and to request additional information from the treating source physicians. (Rec. at 320.) The ALJ was also instructed to examine Plaintiff's residual functional capacity and the claim that Plaintiff could perform only sedentary work. (Id. at 320.)

On December 20, 2002, ALJ Michael P. Friedman held a supplemental hearing, and on April 11, 2003, he denied Plaintiff's application for benefits. (Id. at 253, 301.) ALJ Friedman concluded that Plaintiff had not performed substantial gainful work. (Id. at 253.) Though Plaintiff had a severe impairment, ALJ Friedman found that it was not severe enough to meet or equal a condition in Appendix 1 to 20 C.F.R. Pt. 404, Subpart P, Regulation No. 4. (Id. at 257-58.) Nor did Plaintiff have the residual functional capacity to perform past work as a police

---

[5] The treating physician rule provides that a treating source opinion will be given controlling weight if it is well supported by acceptable medical evidence and is not inconsistent with other substantial evidence in the case record. Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).

officer. (Id.) ALJ Friedman provided a detailed summary of the Plaintiff's medical treatment during and after the relevant period.[6] (Id. at 258-60.) The ALJ considered Plaintiff's medical records from Drs. Weseley, Axelrod, Kulick, Firoozina, Nepomuceno, Lanza, Cordice, and Mammana. (Id.) The ALJ also carefully considered all of Plaintiff's subjective testimony regarding his limitations and pain. (Id. at 260.) After comparing Plaintiff's subjective testimony with the objective medical evidence, the ALJ concluded that Plaintiff's testimony was not fully credible. (Id. at 262.)

To determine if Plaintiff had the residual functional capacity to perform other work, the ALJ considered Plaintiff's age, education, and work experience; the availability of work in the national economy; skill requirements; and physical exertional restrictions. (Id.) On the date he was last insured, Plaintiff was forty-eight years old and considered a younger individual. (Rec. at 261 (citing 20 C.F.R. § 404.1563).) He had a high school diploma and no past relevant skills. (Rec. at 261.) The ALJ applied Medical-Vocational Rule 201.21, included in Appendix 2 of Subpart P, Regulation No. 4, and concluded that Plaintiff had the residual functional capacity to perform sedentary work.[7] (Id. at 261-62 (citing 20 C.F.R. §§ 404.1560(c), 1569).)

Plaintiff appealed the ALJ's decision to the Council. (Rec. at 264.) On April 1, 2004, the Council ordered that the case be remanded for a second supplemental hearing. (Id. at 269.)

_____

[6] The ALJ also noted Plaintiff's medical treatment after the relevant period. (Id. at 260.) Such evidence is not germane to Plaintiff's disability determination. Arnone, 882 F.2d at 38.

[7] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Id. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. Id.

It ordered the ALJ (1) to further investigate whether the objective medical evidence supports the conclusion that Plaintiff could perform the full range of sedentary work and (2) to obtain evidence from a vocational expert to address the issue of what jobs Plaintiff could have performed during the relevant period based on his residual functional capacity. (Id. at 270.)

ALJ Friedman held an additional hearing on December 2, 2004, during which a vocational expert testified. (Id. at 288.) On January 7, 2005, the ALJ issued a ruling once again denying Plaintiff disability benefits. (Id. at 240.) He carefully analyzed the medical evidence provided by Dr. Weseley and once again noted that the objective medical evidence contradicted Plaintiff's subjective testimony. (Id. at 244.) At the hearing, Fass, the vocational expert, identified two jobs within the sedentary range that a person with Plaintiff's limitations could perform. (Id. at 289-90.) Relying on this testimony, the ALJ applied Rule 201.21 of the Medical-Vocational Guidelines and concluded that Plaintiff had the residual functional capacity to do other work. (Id. at 248.)

On appeal, the Council did not agree that Medical-Vocational Rule 201.21 should have been determinative in concluding that Plaintiff was not disabled. (Id. at 231.) The Council instead found that because Plaintiff was unable to sit for "prolonged" periods of time, he could not perform the full range of sedentary work, thereby failing to meet all of the qualifications set forth in Rule 201.21. (Id.) Therefore, the Council decided, the rule should be used as a guideline, taking into consideration Plaintiff's age, education, work experience, and exertional limitations.[8] (Id.) Using Rule 201.21 as a guideline, in concert with the vocational expert's

---

[8] When the Medical-Vocational rules do not exactly coincide with the claimant's condition, a determination should be made using the principles and definitions of the rules as guidelines. Davis v. Shalala, 883 F. Supp at 836.

testimony and the analysis of the objective medical evidence, the Appeals Council concluded

that Plaintiff retained the residual functional capacity to perform a significant number of jobs

existing in the national and local economy, and therefore was not disabled as of December 31,

1995. (Id.)

### C. Plaintiff's Claims

#### 1. Adequate Development of the Record

Plaintiff claims that the ALJ failed to adequately develop the record. (Pl. Br. at 13.) Due

to the non-adversarial nature of a disability benefits hearing, the ALJ has an affirmative duty to

develop the administrative record, even when Plaintiff is represented by an attorney. Perez v.

Chater, 77 F.3d 41, 47 (2d Cir. 1996). The ALJ has an obligation to develop a claimant's

complete medical history by obtaining records from claimant's own medical sources. 20 C.F.R §

404.1512(d). When the evidence received from treating sources is inadequate, the ALJ must try

to re-contact treating physicians or other medical sources to determine if other information is

available. Id. § 404.1512(e)(1). An ALJ is not required to attempt to re-contact a treating

physician for "additional evidence or clarification when it is known from past experience that the

source either cannot or will not provide the necessary finding[s]." Id. § 404.1512(e)(2); see also

Hill v. Barnhart, 410 F. Supp. 2d 195, 208 (S.D.N.Y. 2006). When a claimant is represented by

counsel, his attorney has an obligation to assist the ALJ in fully developing the record.

Truesdale v. Barnhart, No. 03-Civ.-0063 (SAS), 2004 U.S. Dist. LEXIS 1685, at *20 (S.D.N.Y.

Feb. 6, 2004).

During ALJ Friedman's first hearing, he asked Plaintiff's attorney if any attempt had

been made to contact Dr. Weseley, the treating physician:

ALJ: The court directed that . . . Dr. Weseley be contacted for updating and or clarification of his treating opinion. Mr. Kuhn, I guess you weren't able to obtain that or haven't obtained anything like that.

ATTY: No. . . . [T]hat was not practical. . . . [It] couldn't be done. Dr. Weseley was from the police department and . . . treatment ended in 1991, so there's nothing really further from him.

. . . .

ATTY: So. I think that . . . one of the things that the [A]ppeals [C]ouncil wanted to get . . . was [a Residual Functional Capacity ("RFC")] form . . . but that isn't really possible because of the time that's passed.

ALJ: He's not there anymore do you know?

ATTY: I don't know if he's not there anymore . . . but in my experience with those kinds of situations it's not possible to get an RFC in those scenarios.

(Rec. at 303-04.) Because it was made clear by Plaintiff's attorney that an effort to contact Dr. Weseley would be futile, the ALJ was not required to attempt to contact Dr. Weseley. 20 C.F.R. § 404.1512(e)(2).

When a treating physician has provided all of his treatment records to the ALJ, re-contact is not necessary when there is otherwise sufficient information to make a proper determination. Perez, 77 F.3d at 48. An ALJ is not required to re-contact a treating physician every time his opinion is not fully supported by the record. Rebull v. Massanari, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002) (noting that it would undermine the ALJ's duty to assess credibility if the treating physician had to be summoned whenever his opinion was not completely supported by the record).

18

The record illustrates that there was no shortage of medical records regarding Plaintiff's claim of disability. Plaintiff makes no claim that any of the medical reports in the record are incomplete or that documentation of any other medical treatment is missing. See Carroll v. Sec'y of Dept. of Health & Human Servs., 872 F. Supp. 1200, 1205 (E.D.N.Y. 1995) (holding that remand is appropriate when the administrative record includes no medical reports or records from a physician who treated plaintiff for over four years). Although it would have been helpful to know exactly what Dr. Weseley meant by "prolonged," this is not a case in which the record is sparse and incomplete. When an ALJ has a complete medical history and fully considers all of the medical opinions, remand is not appropriate. Hawkins v. Barnhart, 356 F. Supp. 2d 359, 366 (S.D.N.Y. 2005).

Although ALJ Friedman was under no obligation to contact Dr. Weseley, he nevertheless attempted to do so, sending Dr. Weseley a Physical Medical Assessment Evaluation dated January 17, 2003, which was never returned. (Rec. at 329.) There is, therefore, substantial evidence in the record to support the conclusion that the ALJ fulfilled his responsibility to develop the record.

### 2. The Treating Physician Rule

Plaintiff also claims that the Commissioner improperly discounted Dr. Weseley's opinion and failed to follow the well established treating physician rule. (Pl. Br. at 12.) That rule provides that special evidentiary weight must be accorded to the opinions of treating physician. Specifically, the regulations state that more weight is given to opinions from treating sources

than from other medical sources. 20 C.F.R. § 404.1527(d). If treating opinions are well supported by medically acceptable techniques and are not inconsistent with other substantial evidence, they will be given controlling weight. Id. § 404.1527(d)(2); see also Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1996).

ALJ Friedman gave controlling weight to the medical opinion of Dr. Weseley. (Rec. at 244-45.) Although Dr. Weseley noted that Plaintiff had various back conditions and some pain, he also consistently noted throughout his treatment that Plaintiff could perform light work such as dispatch duty. (Id. at 157, 158, 160.) It is well established that to qualify for disability, a claimant must establish more than a mere inability to work pain-free. See Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983); Battle v. Shalala, No. 94-Civ.-2488 (RWS), 1995 U.S. Dist. LEXIS 6976, at *28 (S.D.N.Y. May 23, 1999).

Plaintiff's neurological exam was normal and the two state examiners found that Plaintiff could perform sedentary work. (Rec. at 194, 203, 153.) Dr. Nepomuceno observed that Plaintiff's cervical spine was "unremarkable" and that he had a full range of motion, and he did not observe any swelling, pedal edema, circulatory deficits, or muscle atrophy. (Id. at 187.) He reported that Plaintiff's lumbar spine had flexion to thirty degrees and lateral flexion to twenty-five degrees bilaterally. (Id.) He also observed that Plaintiff had some muscle spasms on the left but did not have any tenderness. (Id.) Plaintiff had ninety degrees of forward flexion in the sitting position and normal external and internal rotation abduction and adduction. (Id. at 187-188.) Additionally, Dr. Nepomuceno reported that straight-leg raising was positive at ten

20

degrees bilaterally while lying down and sitting. (Id.) He noted that Plaintiff could not do any work that required lifting or carrying heavy objects or bending. (Id. at 188.)

The only evidence that indicates Plaintiff had limitations more severe than those shown by objective medical evidence is Plaintiff's own testimony and the opinion of Dr. Mammana. The ALJ, however, correctly decided to give little weight to Dr. Mammana's evaluation. It is well established in the Second Circuit that a chiropractor's opinion is not considered acceptable medical evidence. Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995); Mollo v. Barnhart, 305 F. Supp. 2d 252, 262 (E.D.N.Y. 2004); 20 C.F.R. § 404.1513(d)(1). In addition, Dr. Mammana treated Plaintiff for only two weeks within a seven-year period. (Rec. at 176-81, 214-19.) Furthermore, his assessment of Plaintiff's limited inability to sit for more than two hours a day is inconsistent with his finding that Plaintiff's pain was only "intermittent" and that Plaintiff responded favorably to treatment. (Id. at 176-79.) The limited amount of treatment and inconsistent conclusions provided a substantial basis for the ALJ to discount Dr. Mammana's opinion evidence. There is substantial evidence, including acceptable medical evidence and treating physician opinions, to contradict Dr. Mammana's conclusion. Therefore, the ALJ did not violate his duty to consider the whole record by discrediting Dr. Mammana's findings.

### 3.    Sedentary Work

Despite Plaintiff's assertion to the contrary (Pl. Br. at 15-16), according to the Second Circuit, not being able to perform the full range of sedentary work does not require a finding of disability. Halloran v. Barnhart, 362 F.3d 28, 38 (2d Cir. 2004) (holding that it should not be

21

presumed that all sedentary work requires an individual to sit for six straight hours). Further, the Social Security Administration itself has concluded that:

> [T]he mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.

SSR No. 96-99, at 12-13.

ALJ Friedman posed hypotheticals to Fass, the vocational expert, based on her assessment of Plaintiff's residual functional capacity. (Rec. at 289.) He asked Fass if, given Plaintiff's need to alternate between sitting and standing throughout the day, there were any jobs in the sedentary range that Plaintiff could perform. (Id. at 289-90.) Fass responded that Plaintiff could work as a bench assembler or surveillance system monitor, two jobs existing in significant numbers in the local and national economy. (Id.) Plaintiff claims that the ALJ was unable to ask proper hypothetical questions to Fass without knowing exactly what Dr. Weseley meant by "prolonged" periods of time. (Pl. Br. at 17-18.) The record, however, is full of evidence that would form a framework within which the ALJ could raise hypothetical situations that accurately reflected Plaintiff's condition. Based on the testimony of the vocational expert, despite Plaintiff's inability to perform the full range of sedentary work, there is substantial evidence to support the conclusion that Plaintiff could perform work in the national economy. O'Dell v. Barnhart, 332 F. Supp. 2d 560, 564 (W.D.N.Y. 2004) (holding that remand is

unnecessary when the ALJ makes a full and accurate recitation of the record to the vocational expert).

### 4.    Subjective Pain Evidence

In each of the three administrative hearings, the ALJ questioned the credibility of Plaintiff's subjective pain evidence. (Rec. at 18, 262, 248.) The ALJs concluded that Plaintiff's subjective pain testimony was inconsistent with objective medical evidence and was not credible. (Id.) ALJ Friedman noted that between 1990 and 1994, Plaintiff did nothing more than take Tylenol for his back pain.

At the hearings, Plaintiff described his pain as both "constant and unbearable" and "intermittent." (Id. at 245, 18.) He testified that he could not stand for more than ten minutes or sit for more than twenty minutes and that he needs to lie down throughout the day. (Id. at 41-42, 108, 114.) No medical evidence in the record supports these assertions, whether they refer to the relevant period or some subsequent period. The Commissioner is not obligated to accept a claimant's testimony about his own symptoms. Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998). When a Plaintiff's symptoms suggest a greater restriction of functions than can be determined by objective evidence alone, consideration will be given to other factors. 20 C.F.R. § 404.1529(c)(3); see also Taylor v. Barnhart, No. 03-6072, 2003 U.S. App. LEXIS 23805, at *5 (2d Cir. Nov. 21, 2003).

Plaintiff neither returned to a physician (except for two weeks of treatment at a chiropractor) nor tried medication other than Tylenol #3 between 1990 and 1997. (Rec. at 244.)

23

Plaintiff's lack of treatment may indicate that his pain was not sufficiently intense, frequent, or persistent to be debilitating. Truesdale, 2004 U.S. Dist. LEXIS 1685, at*20-21; C.F.R. § 404.1529(c)(3); SSR 96-7p. Given Plaintiff's inconsistent statements, sporadic treatment, and lack of corroborating objective medical evidence, there was substantial evidence in the record to support the finding that Plaintiff's subjective evidence was not credible and that Plaintiff is not disabled.

**III.    Conclusion**

For the reasons set forth above, Plaintiff's cross-motion is DENIED and the Commissioner's motion is GRANTED. This case is therefore dismissed. The Clerk of Court is directed to close this case.

Dated: June 29, 2007
        Brooklyn, N.Y.

                              /signed/
                              NICHOLAS G. GARAUFIS
                              United States District Judge